# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 02 CR 906 |
| v. | ) | |
| | ) | |
| DARNELL FIELDS | ) | Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

The Seventh Circuit on June 9, 2004 reversed this court's denial of defendant Darnell Fields' motion to suppress. This court had denied the motion to suppress based on its finding that Tammy Winston, defendant's wife, who resided in the apartment where the search took place, had voluntarily signed a consent form consenting to the search. The Seventh Circuit ruled that the signing of the consent form was an insufficient basis upon which to deny the motion to suppress inasmuch as the consent may have been tainted if, as defendant argued, the entry into the apartment was unlawful. On remand, therefore, this court was ordered to determine whether the entry into Fields' apartment violated the fourth amendment. If the entry was determined to have been unlawful, this court was to proceed to determine whether the seizure of the handgun and the defendant's subsequent statement were sufficiently distinguishable to be purged of the taint of the unlawful entry. The court was ordered to make these determinations from the existing record, absent a compelling reason to do otherwise. *United States v. Fields,* 371 F.3d 910, 917 (7th Cir. 2004).[1] Having reviewed the evidence presented at the hearing on the motion to suppress, the court concludes that the government cannot carry its burden of establishing that the initial entry into the

---

[1] Due to the Seventh Circuit's specific directive, the court cannot consider the government's new argument that the handgun should not be suppressed under the "inevitable discovery" doctrine. Even if it were appropriate for the court to consider a new argument raised at this stage of the proceedings, the government's discussion of "inevitable discovery" is totally undeveloped and lacks any discussion of controlling caselaw.

Winston/Fields apartment was lawful. Nor can the government establish that Winston's consent to the search, or Fields' admission once confronted with the gun found in the apartment, was sufficiently distinguishable from the unlawful entry to be purged of its taint.

While the evidence presented at the hearing on the motion to suppress indicated that a number of police officers were present at the time of the entry into the defendant's and Winston's apartment at 5253 West Potomac, the government chose to rely exclusively on the testimony of Chicago Police Officer George Gass as to what occurred. Officer Gass testified that while Officers Rice and McDermott remained outside with Fields, he, together with Officers Hoffman and Burzinski, entered the apartment building through a door that was unlocked and partially opened. When they reached the apartment at the first landing, they knocked on the door and a woman, later identified as Tammy Winston, opened the door and identified herself as Darnell Fields' wife. Officer Gass testified that he asked for permission to enter so that she could explain information that the officers had received, and Winston agreed. Once inside the apartment, Officer Gass asked Winston if Fields had a gun, to which question she did not respond. He then requested permission to search the apartment for a gun and Winston gave her consent. She was asked to sign a written consent to search form, and she complied. The officers then searched the apartment, locating a Taurus 38 caliber revolver in a dresser drawer.

According to the testimony of Officer Gass, he then left the apartment and walked downstairs to where the defendant was waiting with the other officers, now in the backseat of Officer Gass' car. Officer Gass testified that he explained to Fields that he had recovered a weapon from his apartment and showed it to him. Officer Gass then explained to the defendant that he was under arrest and advised him of his *Miranda* rights. He asked him if he understood his rights, and the defendant

2

responded affirmatively and added, "[B]ut, you know, that thing is just for protection." (Tr. 35.) Officer Gass testified that he then asked the defendant additional questions which he refused to answer. (Tr. 35.)

This court made plain during the hearing on the motion to suppress that it had significant problems with Officer Gass' testimony. Revisiting his testimony since the time of the hearing has not increased the court's confidence in its veracity. First, the history of his conduct in this case demonstrates a willingness to embellish the truth in a misleading manner when giving testimony under oath. Second, his testimony in this hearing was seriously contradicted by other witnesses, some of whom appeared credible to the court.

First, the evidence revealed that at a preliminary hearing in state court, before this case was transferred to federal court, Officer Gass testified that about 20 minutes before the officers' first contact with the defendant on the evening in question, they received a tip from a "concerned citizen" that an individual named Darnell Fields lived at 5253 Potomac and stored guns there for the Gangster Disciples street gang. At the suppression hearing in this case, however, Officer Gass testified that the tip came from a female observed by the officers walking on the street who, when she could not avoid the officers by walking in the other direction, admitted to being in the neighborhood to try to buy drugs. When she could not or would not tell the officers anything about her hoped-for drug source, the officers did not press her on the subject of drugs but changed the subject and asked her if she knew anyone in the area with guns. Without hesitation, she responded "Darrell," "a young short guy" that the officers would not be able to miss, and specified that he lived in a building on the southeast corner of Potomac and Lockwood at the second door from the corner. It is unclear to this court why Officer Gass chose to misdescribe the tipster as a concerned citizen,

rather than as a narcotics suspect, and as the jury instructions tell us, an inconsistency can be due to innocent misrecollection, but the court is concerned that this episode appears to demonstrate a willingness on Officer Gass' part to give misleading, if not altogether false, testimony under oath.

Putting aside Officer Gass' description of the tipster, his account of his interaction with this "concerned citizen" strains credulity. Here is a person who, according to Officer Gass' testimony on cross-examination had a "deer in the headlights look" and appeared to be trying to get out of the area quickly to avoid the officers. This person, who clearly wanted to avoid interaction with the police and was unwilling or unable to tell them anything about her drug source in the neighborhood, was perfectly willing without any coaxing or inducement to identify the defendant (or at least a young short guy named Darrell living where the defendant lived) as a person storing guns for gangs in the neighborhood.[2] The "concerned citizen" gave the police a hopelessly vague description of this Darrell (young and short) but assured the police that they could not miss him. And she was right. According to Officer Gass, as the officers approached the building she had pointed out to them, a young short guy named Darnell walked out of the building the concerned citizen had identified as Darrell's residence. The court finds itself very skeptical about this testimony.

Second, numerous witnesses gave testimony which, in small or large part, contradicted Officer Gass' account of the events of the evening. Shenise Fields and Kevin Sharp both testified that they observed officers removing keys from Darnell Fields' pocket before entering his apartment

---

[2] Officer Rice's testimony is not entirely consistent with Officer Gass' testimony that he was proceeding on the basis of a tip that an individual was storing *guns* for a gang at Fields' location. Officer Rice testified that he went to that location on the basis of a conversation with Officer Gass that they were conducting an investigation "regarding a black male that had *a weapon*" at his residence. (Tr. 128.) Officer Rice's version was consistent with a portion of Officer Gass' preliminary hearing testimony in the Circuit Court of Cook County on May 22, 2002, that he had received information that Fields was storing "a gun" in the apartment.

4

building. Shenise Fields testified that she was watching the officers and Darnell Fields at the time she saw the officers remove the keys, and Sharp testified that he was handcuffed right next to Darnell when keys were found in both their pockets. His keys, but not Darnell's, were replaced in his pocket.

Another witness, Lamont Curtis, did not see keys removed from Darnell's pocket but saw the officers walk toward the building with something in their hands after searching the pockets of the handcuffed individuals. Estella Fields saw the police searching Darnell's pockets but could not see if anything was removed. Officer Gass testified, in contrast, that only a pat-down of Darnell Fields was conducted at this stage in the evening's events.

Both Tammy Winston and Shenise Fields contradicted Officer Gass' account of the officers' entry into Fields' apartment. Tammy Winston testified that she was asleep, and drunk, when she was awakened in her bedroom by three policemen shining a flashlight in her face. According to Winston, the officers never asked permission to enter the apartment or her bedroom, but accosted her asleep. She testified that she was "scared," and remained in the bedroom until she was ordered to go into the living room and sit on the couch. She testified that at this point, she heard Shenise Fields knocking on the door and stating, "[M]ama said do they have a search warrant, mama said do they have a search warrant." Tammy Winston was a problematic witness. On the witness stand, she appeared to be significantly impaired, either drunk, or drugged, or crying, or some combination of the three. The court notes, however, that her testimony as transcribed is coherent and reasonably consistent. In addition, her testimony is largely consistent with that of Shenise Fields, who struck the court as a credible witness. Shenise testified that she saw the officers enter Darnell Fields' apartment building and followed them. When she entered the building, there was no one in the

hall–the officers had already entered the apartment–so she ran outside to the apartment's bedroom window where she could see the officers with their flashlights and hear them ordering Tammy Winston to get up. She testified she then ran back into the hallway where she yelled to Tammy to ask the officers if they had a search warrant, saying twice, "Tammy, mama said if they don't have a search warrant they can't search your house." (Tr. 310.)

Having reviewed the evidence in response to the Seventh Circuit's mandate, the court concludes that the testimony of Officer Gass cannot carry the government's burden of justifying this warrantless entry. The court finds the testimony of four witnesses that Darnell Fields' pockets were searched, the testimony of two witnesses that keys were retrieved during that search and of an additional witness that the officers had keys when they entered the apartment building, taken together with the testimony of Tammy Winston and Shenice Fields that the officers, rather than knocking on the front door and getting Tammy Winston's consent to enter the apartment, entered the apartment and her bedroom without permission and woke her up, more credible than the unsupported testimony of Officer Gass. The warrantless, nonconsensual entry into Fields' apartment violated the Fourth Amendment.

The court next must determine whether Winston's consent to search, albeit voluntary, was tainted by the illegal entry. The Seventh Circuit has instructed that in making this determination, the court must look to "the temporal proximity of the illegal conduct to the evidence obtained, the presence of any intervening circumstances, and the purpose and flagrancy of any police misconduct." *United States v. Fields, supra* at 915. Having determined that the entry into the apartment was unlawful and applying the standards set forth by the court of appeals, the court must conclude that Winston's consent was tainted. The evidence strongly suggests that only minutes elapsed from the

time a drunken Winston was awakened by officers in her bedroom to the time she signed the consent form. Officer Rice, who brought in the consent form for Winston to sign, estimated that less than five minutes elapsed between the other officers' entry into the apartment and their call to him to bring up the consent form, which he did immediately. Shenise Fields' testimony that attempting to follow the officers, she ran into the hallway, then ran out to the window and back into the hall (by which time Winston's testimony established Winston was in the living room on the couch) could have taken only minutes. There is no evidence that any substantial period of time elapsed, such as would allow Winston, having been awakened from a drunken sleep, to make a decision to allow the search independent of the undoubtedly shocking and frightening effect of the unlawful entry. Nor were there any intervening circumstances of consequence. On this record, the court must find that the officers entered without a warrant and without consent for the purpose of searching for a gun, entered a darkened apartment and woke its inhabitant without knocking; this is manifestly a flagrant violation of the Fourth Amendment, certain to startle and discomfit the inhabitant. While the court concluded that the actions of the officers did not rise to the level of coercion with respect to the signing of the consent form, the court concludes that the officers' blatant disregard for the protections of the fourth amendment had the "purpose" of intimidating Winston into agreeing to a search. Few individuals, awakened in the night in an inebriated condition by police with flashlights in one's bedroom, would think that resisting the officers' request to search was an option. Winston herself testified that she did what the officers requested because she believed that if she failed to do so, she might be arrested. Applying these standards, the court must conclude that the unlawful entry tainted Winston's consent. As a result, the handgun must be suppressed as fruit of the unlawful entry.

With respect to Darnell Fields' statement, the result must be the same. Officer Gass seized Fields' keys, rather than requesting permission to enter the apartment. The officers entered the apartment quickly, before Shenise Fields could follow them into the hallway. As soon as Officer Gass found the gun, he went downstairs, arrested Fields (who was in the police car) and confronted him with the seized gun, eliciting Fields' statement that he had the gun only for protection. Officer Gass testified that he read Fields his *Miranda* warnings *after* confronting him with the gun but *before* Fields made his statement, a sequence of events likely to blunt the effects of the *Miranda* warnings with the psychological impact of displaying the gun. No effort was made to have Fields sign an acknowledgment of the waiver of his *Miranda* rights, something that might have attenuated the taint of the illegally seized handgun to some extent. Rather, Officer Gass' decision to administer *Miranda* warnings only after having showed Fields the gun and told him it had been found in the apartment appears calculated to have minimized, to the extent possible, the force of those warnings. *See e.g., Brown v. Illinois*, 422 U.S. 590 (1975) (statement made almost two hours after illegal arrest, and post *Miranda* warnings, was not sufficiently removed from the constitutional violation to remove the taint). Significantly, thereafter, Fields refused to make further statements to the officers, strongly suggesting that he spoke only to the extent he felt pressured to do so when confronted with the illegally seized gun.

While Fields did not testify, the evidence that his keys were taken from his pocket, that the officers had him point out his apartment, that the officers immediately went up the stairs, that Shenise Fields was running from hallway to window to hallway yelling at Tammy Winston to assert her rights and that Officer Gass emerged quickly from the apartment to confront Fields with the gun, reveals a chaotic situation in which Fields witnessed legal niceties being swept aside. The

8

government's burden, when its provokes a confession with illegally seized evidence, is substantial. A confession that is "influenced by unlawfully seized evidence . . . must be suppressed unless *intervening* events demonstrate that illegality did not cause the confession." *United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000)(emphasis added). The only intervening event that occurred here was the giving of oral *Miranda* warnings, following immediately upon Officer Gass' display to Fields of the illegally seized firearm. Given the sequence of events–the rush of the officers to enter the apartment, seize the gun and confront Fields with it–the circumstances do not suggest that a rapid recitation of *Miranda* warnings, immediately after confronting Fields with the gun just seized from his apartment, constitutes sufficient intervening circumstances to dissipate the taint of the unlawful seizure under *Jones*.

The motion to suppress the handgun, as well as Fields' statement in response to being confronted with it, is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 15, 2005